## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MELISSA RUSH,

       **Plaintiff,**

       **v.**                           **Case No.  06-2494-JWL**

SPEEDWAY BUICK PONTIAC
GMC, INC.,

       **Defendant.**

---

## MEMORANDUM AND ORDER

Plaintiff Melissa Rush was formerly employed by the defendant automobile dealership Speedway Buick Pontiac GMC, Inc.  She alleges that she was subjected to sexual harassment perpetrated by a supervisor named Danny "Dan" Conroy, that members of management were aware of the harassment, and that she felt compelled to resign when Mr. Conroy continued to act inappropriately.  She asserts claims for hostile work environment, retaliation, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  This matter is currently before the court on Defendant's Motion for Summary Judgment (doc. #41) and Defendant's Motion to Amend Pretrial Order (doc. #37).  For the reasons explained below, the court will grant defendant's motion to amend the pretrial order.  The court will also grant defendant's motion for summary judgment on plaintiff's retaliation claim insofar as that claim is based on alleged retaliation for her written complaint as well as on her claim for back pay insofar as that claim is based on the time period from March of

2006 to March of 2007. The court will otherwise deny defendant's motion for summary judgment as to plaintiff's hostile work environment claim, her retaliation claim insofar as that claim is based on alleged retaliation for her oral complaint, her constructive discharge claim, the disputed aspects of her claim for back pay, and her punitive damage claim.

## STATEMENT OF MATERIAL FACTS[1]

Ms. Rush was eighteen at the time she was employed by Speedway as a parts consultant/driver in its parts department from March 2005 to November 2005. At the time she was hired, Mr. Conroy had been the manager of the parts department at Speedway since 2003. Glen Parks became employed at Speedway in March of 2005 as the individual who was scheduled to replace Mr. Conroy as the parts department manager. During the first week and a half to two weeks of her employment, Mr. Conroy was training Mr. Parks to take over as the parts department manager. When Mr. Conroy left, he was retained by Speedway as a consultant for several months between March 2005 and November 2005. During that time period, he served as a tutor to Mr. Parks, who was new to management at Speedway. He also came in and straightened out the special tools and parts, and filled in for Mr. Parks occasionally. Mr. Conroy was fifty-five years old at that time.

---

[1] Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to plaintiff, the nonmoving party.

Mr. Conroy had joked with "most of the girls that worked around here" about sexual issues.  The type of things he would say to them included comments such as "[d]id you get any last night or smile if you got some last night."   More specifically, he made "nasty" comments to Ms. Rush such as the following: "are you wearing any underwear?"; "[a]re you a moaner or a screamer in bed?"; when she dyed her hair brown he asked her if the "hair on [her] head now matched the hair on [her] pussy"; he told her that if she would go in the back room with him "he would show [her] how young he was in bed"; he said that "maybe if you weren't up all night having sex, you wouldn't be tired"; and he said that "he bets he is better in bed than [her] boyfriend and that he can prove it."

Mr. Parks testified in his deposition that he observed Mr. Conroy make comments to Ms. Rush that he believed were inappropriate, such as making references about Ms. Rush and her sex life and her body.  Mr. Parks could tell that Ms. Rush found Mr. Conroy's comments to be offensive, and Mr. Conroy's conduct concerned Mr. Parks.  Mr. Parks had never overheard Ms. Rush make any statement that he considered to be inviting those types of comments from Mr. Conroy.  But, Mr. Parks' philosophy about Mr. Conroy's conduct "was he was leaving, he was one of the good old boys there, nothing was going to happen."  By "good old boy" Mr. Parks meant that Mr. Conroy was "untouchable" – that they were "going to turn the other cheek or give him a pardon because he's one of the guys, he works here, he's been here for five years."  Mr. Parks also witnessed Mr. Conroy make inappropriate comments about other female employees.  Mr. Parks told Mr. Conroy that his conduct was inappropriate, but Mr. Conroy's reaction was essentially "okay, whatever, I'm Dan Conroy,

3

I'm going to do what I want."  Mr. Parks had worked at a number of places in the auto industry.  When he was asked in his deposition if he had ever worked in an environment like he witnessed at Speedway where Mr. Conroy engaged in the type of conduct discussed during his deposition, he responded, "I've never worked in a place like that ever in my life, period."

Mr. Parks was Ms. Rush's direct supervisor, and she felt that she could confide in him. At some point between March 10, 2005, and March 15, 2005, she complained to Mr. Parks about Mr. Conroy's comments.  During that discussion, Mr. Parks offered to discuss the issue with upper management, but Ms. Rush asked him not to do so.  According to Mr. Parks, he and Ms. Rush came to the conclusion that nothing was going to happen because Mr. Conroy was on his way out.  At that time, neither of them knew that Mr. Conroy would be back as a consultant.  They agreed not to take any other action regarding Mr. Conroy's conduct.  Ms. Rush once again approached Mr. Parks some time after March 15, 2005, and complained about sexual harassment by Mr. Conroy.  They talked about it and once again decided to just let it go because nothing was going to happen.  Mr. Parks did not report Mr. Conroy's behavior to any other management employee.

One of Speedway's contentions in this lawsuit is that Ms. Rush was not subjected to a hostile work environment because she had limited interaction with Mr. Conroy during her employment at Speedway and, consequently, Mr. Conroy's comments were only "occasional." In support of this theory, Speedway points out that, as a parts driver, Ms. Rush spent about thirty percent of her time at work outside of the dealership doing deliveries

"driving about town." But, plaintiff testified in her deposition that during the first week and a half to two weeks of her employment, she spent "quite a bit" of time with Mr. Conroy on a daily basis. According to Mr. Conroy, after he left Speedway he worked in the parts department no more than fifteen days and may have visited the parts department on three or four other occasions. But, according to Ms. Rush, even after Mr. Conroy left Speedway he still came into the store at least once a week. He "definitely stayed very much in contact with the dealership" and she believed that an estimate that he only actually worked fifteen days "would be a low number." Mr. Parks testified that when Mr. Conroy filled in for him as the parts department supervisor, "she knew he would quote, unquote, be the authoritarian figure in there, the manager figure in there and so she would listen to what he had to say."

John Gremmer is Speedway's general manager. On or about November 2, 2005, Ms. Rush made an oral complaint to Mr. Gemmer about Mr. Conroy's conduct. In response to that oral complaint, Mr. Gemmer "just shrugged it off and he's like okay, well, I'll talk to him and that was the end of the conversation."

On November 2, 2005, Mr. Parks was terminated from his employment at Speedway. Mr. Conroy was rehired full time as Speedway's parts department manager.

Upon learning that Mr. Conroy was going to be Ms. Rush's direct supervisor, on or about November 5, 2005, Ms. Rush went and made a written complaint to Speedway's management. In that complaint, she described Mr. Conroy as a "gross old man" who said many "gross" comments to her such as the following: (after plaintiff had died her hair) "so does your hair now match the hair on your twot [sic]"; "let's go in the back room and I'll

5

show you how young I am in bed"; he asked her many times "if I spit or swallow"; is she "crazy in bed"; and is she a "screamer or a moaner."  She also reported in her statement that Mr. Conroy "talked about my boobs many times like comparing other girls to mine saying that [theirs] are bigger or smaller."  She stated that she overheard Mr. Conroy describe himself to a male co-employee as having a Ph.D. in being a pervert.

The same day that plaintiff made her written complaint, the management at Speedway confronted Mr. Conroy with Ms. Rush's allegations.  When Mr. Conroy was asked if her allegations were true, he said that they were and that those things had in fact occurred.  Thus, he admitted that he had made the comments in question.  According to Mr. Conroy, he believed that Ms. Rush did not find the comments offensive because she would always laugh at them.  Speedway counseled Mr. Conroy, and he signed a written acknowledgment that if he engaged in any similar conduct in the future it would be grounds for immediate termination of his employment.  Daniel F. Ladd, the president of Speedway, was involved in determining Mr. Conroy's discipline, although he himself did not speak with Mr. Conroy about the harassment.  Mr. Conroy received a written warning instead of being terminated because, according to Mr. Ladd, "I think that everybody should get a second chance."  Mr. Ladd believed that termination was "probably too extreme at that time."

After visiting with Mr. Conroy, Mr. Gemmer presented Ms. Rush with three options: (1) stay in her current position under Mr. Conroy, (2) take the position of porter which was a physically demanding job and one that she could not physically do, and which was in no way a comparable position, or (3) quit.  Mr. Ladd understood that regardless of whether Ms.

6

Rush returned to work back in sales or as a porter, she and Mr. Conroy would still be working together in the same general vicinity and would still have interaction. According to Ms. Rush, she "physically couldn't do the porter job and I couldn't quit. I mean I was 18 years old and had my own house . . . . I had bills so I tried to do the parts job." She felt that she had no choice but to take her position in the parts department back and try to make it work. She and Mr. Gemmer both signed a memorandum dated November 8, 2005, which stated an understanding that any further harassment would not be tolerated by her or Speedway's administration.

After Ms. Rush returned to duty in the parts department, Mr. Conroy made no sexually suggestive comments directly to her. But, she promptly left her employment with Speedway and did not return. She left because Mr. Conroy was still making comments about other women, other customers, and other people at work. According to Ms. Rush, "I could tell that he didn't respect, you know, anything that had just happened or what I had gone through because he was still doing it. Not towards me but in my presence." Ms. Rush made no further complaints to Speedway's management about Mr. Conroy's conduct after she returned to duty in the parts department. Instead of reporting his conduct, she abandoned her employment. She decided to leave and not return to work "because I didn't want to put myself through it anymore, I didn't - at that point it didn't matter what I thought or felt anyway, so why would they have cared." Speedway's office manager, Lila Nichols, attempted to contact Ms. Rush by telephone for two consecutive days in an effort to determine the reason for her absence, but Ms. Nichols was unable to reach Ms. Rush.

Speedway contends that it cannot be liable for punitive damages in light of its good faith efforts to prevent harassment.  In support of this argument, Speedway points out that before Ms. Rush was hired Speedway had implemented a policy prohibiting sexual harassment and had implemented procedures by which an employee could report sexual harassment by either notifying management or by use of a toll free employment hotline.  This policy also required managers and other supervisors to report any observed or reported harassment to defendant's general manager or to the hotline.  Both Ms. Rush and Mr. Parks signed acknowledgments that they had received copies of this policy.  Speedway provides sexual harassment training and testing to its employees via the Internet through an outside vendor, Ethos.  Messrs. Parks and Conroy both underwent training and testing through Ethos.

Plaintiff points out, however, that Mr. Parks did not know that there was any type of employee hotline available for employees who believed they were subject to discrimination or harassment in the workplace to report such conduct.  Mr. Parks did not provide Ms. Rush with any sexual harassment training other than Ethos, which was essentially training on the Internet concerning situations which constitute sexual harassment.  There is no evidence that there was any training with respect to how a supervisor was to report harassment.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all

8

reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001). Rather, the nonmoving party

9

must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## ANALYSIS

For the reasons explained below, the court will deny defendant's motion for summary judgment on plaintiff's hostile work environment claim because the record contains genuine issues of material fact about whether Mr. Conroy's harassment of Ms. Rush was sufficiently severe or pervasive. The court will also deny summary judgment on plaintiff's retaliation claim insofar as that claim is based on alleged retaliation for her oral complaint to Mr. Gemmer because the court construes the pretrial order to embrace this claim and Speedway has not advanced any substantive ground upon which it is entitled to summary judgment on this aspect of plaintiff's retaliation claim. Insofar as plaintiff's retaliation claim is based on alleged retaliation for her written complaint, however, the court will grant summary judgment because she was presented with the alternative of no change in the terms and conditions of

her employment, which certainly does not constitute "adverse" employment action.  The court will deny summary judgment on plaintiff's constructive discharge claim because a rational trier of fact could conclude based on the record that the circumstances had become so intolerable that she had no reasonable choice but to resign.  The court will grant summary judgment on the undisputed aspect of her claim for back pay based on the time period from March of 2006 to March of 2007, and will deny summary judgment as to the remaining disputed aspects of that claim.  Lastly, the court will grant defendant's motion to amend the pretrial order to assert a *Kolstad* good faith defense and will deny defendant's motion for summary judgment based on that defense.

## I.    Hostile Work Environment Claim

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful practice for an employer . . . to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  This statutory provision prohibits subjecting an employee to a hostile work environment.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986); *Harsco Corp. v. Renner*, 475 F.3d 1179, 1185 (10th Cir. 2007).  Speedway contends that it is entitled to summary judgment on the grounds that Mr. Conroy's conduct was not sufficiently severe and pervasive to be actionable as a hostile work environment claim.  To constitute actionable sexual harassment, a plaintiff must show "that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

11

working environment." *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 798 (10th Cir. 2007) (quotation omitted); *Riske v. King Soopers*, 366 F.3d 1085, 1091 (10th Cir. 2004). To evaluate whether a working environment is objectively hostile or abusive, the court examines all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harsco Corp.*, 475 F.3d at 1187; *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005). The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact. *PVNF, L.L.C.*, 487 F.3d at 798; *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).

Speedway contends that Ms. Rush's hostile work environment claim cannot withstand summary judgment because she was only subjected to a number of oral comments referring to sex rather than misconduct involving physical contact. It is well settled, however, that a "[p]laintiff is not required to produce evidence of physical abuse or contact to establish a hostile work environment." *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1417 (10th Cir. 1997); *see, e.g.*, *PVNF, L.L.C.*, 487 F.3d at 797-800 (reversing district court's grant of summary judgment on hostile work environment claim where employee was subjected to comments about a woman's "appropriate" role in the workplace as well as sexual epithets, and she intercepted a vulgar email describing her genitalia); *Harsco Corp.*, 475 F.3d at 1185-89 (affirming jury verdict based on hostile work environment theory where the evidence revealed "an environment polluted with gender-specific comments and behavior that

12

exceeded . . . mere flirtatiousness or baseness"). Here, Mr. Conroy's comments to Ms. Rush were vulgar and sleazy, referring to her genitalia and her private sex life as well as his own professed sexual prowess. Those types of comments would be deplorable and humiliating to any reasonable employee in Ms. Rush's position and, indeed, intimidating given Mr. Conroy's position as a far more senior employee compared to Ms. Rush being an eighteen-year-old employee who was new to the company. Even Mr. Parks could see that Ms. Rush did not welcome Mr. Conroy's conduct and he did not see that she had said anything to encourage it. Clearly, Mr. Conroy's conduct was severe enough that it unreasonably interfered with Ms. Rush's work performance, as she apparently chose the dire alternative of leaving her job rather than continuing to endure his sexual commentary. Under these circumstances, Speedway's argument that Ms. Rush's claim fails simply because no physical contact was involved is without merit.

Speedway also contends that the summary judgment record reflects that Ms. Rush was only occasionally subjected to Mr. Conroy's oral comments. The court rejects this argument for two reasons. First, the summary judgment record is not clear about the frequency of Mr. Conroy's comments. A rational trier of fact viewing the record in the light most favorable to Ms. Rush could certainly find that the harassment was pervasive during the first week and a half to two weeks of Ms. Rush's employment when she was working primarily in the office, that once she was out delivering parts she still had occasional contact with him, that the vulgar commentary was pervasive each time the two did have contact, and that Mr. Conroy's conduct continued (albeit, directed at others rather than at Ms. Rush) even after she

13

complained to management.  Based on this, it could be reasonably inferred that Ms. Rush was invariably barraged with Mr. Conroy's unwelcome comments nearly every time he was around her.  The second reason that the court rejects defendant's argument concerning the arguably "occasional" nature of the harassment is because the objectionable conduct must be either "severe **or** pervasive."  *Meritor Sav. Bank, FSB*, 477 U.S. at 67 (emphasis added).  The relevant test is a disjunctive one, requiring that the harassing conduct be sufficiently severe or sufficiently pervasive.  *Nw. Fin. Acceptance, Inc.*, 129 F.3d at 1413.  When examining all of the circumstances involved, both the frequency of the discriminatory conduct and its severity are factors that must be considered.  *Harsco Corp.*, 475 F.3d at 1187; *Chavez*, 397 F.3d at 832.  Here, a rational trier of fact could find that Mr. Conroy's comments were so crude so as to offset any arguable infrequency.  In sum, viewing the summary judgment record in the light most favorable to Ms. Rush, she was subjected to gender-based intimidation, ridicule, and insult by Mr. Conroy that was sufficiently severe or pervasive to alter the conditions of her employment by creating an abusive working environment.  This is sufficient for plaintiff to withstand summary judgment on her hostile work environment claim and, therefore, defendant's motion for summary judgment on this claim is denied.

## II.     Retaliation Claim

Plaintiff's theories in support of her retaliation claim are essentially twofold.  First, she contends that she engaged in protected activity on or about November 2, 2007, when she orally complained to Mr. Gemmer about Mr. Conroy and that Speedway's subsequent

rehiring of Mr. Conroy as her direct supervisor constituted retaliation.  Second, she contends that she once again engaged in protected activity days later when she made her written complaint about Mr. Conroy's conduct and that Speedway retaliated against her by virtue of the manner in which management handled her written complaint.  Speedway advances separate grounds for summary judgment on each aspect of plaintiff's retaliation claim.

     A.     <u>Oral Complaint to Mr. Gemmer</u>

Speedway's sole argument in support of its motion for summary judgment with respect to Speedway's alleged retaliation for plaintiff's oral complaint to Mr. Gemmer is that the court should disregard this aspect of her retaliation claim because it falls outside the scope of her contentions in the pretrial order.  The court has carefully reviewed the pretrial order and finds nothing that excludes any alleged retaliation for her oral complaint just days before her written complaint, or anything that expressly limits that claim solely to alleged retaliation only for her written statement.  In fact, plaintiff's contentions in the pretrial order specifically state that "members of management" (plural, meaning more than just Mr. Parks) were aware of Mr. Conroy's alleged sexual harassment prior to Ms. Rush's written complaint.  Thus, the court will liberally construe the pretrial order to embrace a theory that Speedway retaliated against her for her oral complaint. *See Whalley v. Sakura*, 804 F.2d 580, 582-83 (10th Cir. 1986) (pretrial order is to be liberally construed to include all legal and factual theories inherent in the issues defined therein); *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979) (pretrial order is to be liberally construed to cover any legal or factual theories that might be embraced by its language).  Additionally, the court notes that

defendant was on notice of Ms. Rush's oral complaint to Mr. Gemmer, as she testified in her deposition about making this complaint in connection with Mr. Gemmer's handling of an incident involving another Speedway employee who allegedly made inappropriate comments to her. Speedway does not contend that it is entitled to summary judgment on this aspect of plaintiff's retaliation claim based on any substantive ground. Accordingly, this aspect of defendant's motion for summary judgment is denied.

      *B.*     <u>*Written Complaint*</u>

As to the second aspect of plaintiff's retaliation claim, defendant contends that it is entitled to summary judgment because Speedway's response to plaintiff's written complaint did not constitute a materially adverse action. A challenged employment action is adverse for the purposes of a retaliation claim if "a reasonable employee would have found [it] materially adverse." *McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (quotation omitted; brackets in original). Materially adverse means that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006); *accord Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1265 (10th Cir. 2007) (quoting *Burlington Northern*). Although trivial harms such as "petty slights or minor annoyances" are not actionable, the Supreme Court crafted this standard in "general terms because the significance of any given act of retaliation will often depend on the circumstances." *Burlington N.*, 126 S. Ct. at 1415 ("Context matters."). The court must

focus on the "materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position" so as to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.*

Plaintiff's second theory in support of her retaliation claim is that she engaged in protected activity when she made her written complaint about Mr. Conroy's conduct. She contends that she was subjected to materially adverse action when, in the course of handling her complaint, Mr. Gemmer presented her with the alternatives of either (1) staying in her current position, (2) transferring to a porter position which, she contends, she was physically incapable of performing, or (3) quitting. Plaintiff likens option (2) to the situation presented in *Burlington Northern*, in which the Supreme Court found that whether a similar reassignment of duties constituted a materially adverse action was a jury question. Plaintiff's argument might have some merit if Speedway had actually transferred Ms. Rush to the porter position. But, in this case, unlike in *Burlington Northern*, Ms. Rush still had the option of continuing to remain in her current position with Mr. Conroy as her supervisor, and she chose to do so. There is simply nothing "adverse" about this action. In fact, a reasonable employee presumably would have felt somewhat vindicated by the fact that Mr. Conroy was counseled and notified that if he engaged in similar conduct in the future it would be grounds for immediate termination of his employment, and Speedway management had notified Ms. Rush that any further misconduct by Mr. Conroy would not be tolerated. No rational trier of fact could find based on these circumstances that the manner in which Speedway handled

her written complaint would have dissuaded a reasonable employee in her position from having made the complaint. Accordingly, Speedway's motion for summary judgment on this aspect of plaintiff's retaliation claim is granted.

### III.   Constructive Discharge Claim

A Title VII plaintiff who advances a compound claim – a constructive discharge claim premised on a hostile work environment – "'must show working conditions so intolerable that a reasonable person would have felt compelled to resign.'" *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1174 n.19 (10th Cir. 2007) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004)). "Working conditions must be so severe that the plaintiff simply had no choice but to quit." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004). In evaluating whether the employee's working conditions would cause such a feeling in a reasonable person, the court applies an objective test under which neither the employee's subjective views of the situation, nor the employer's subjective intent, are relevant. *PVNF, L.L.C.*, 487 F.3d at 805. The plaintiff's burden in a constructive discharge case is substantial because the plaintiff must show that the working conditions imposed by the employer are not only tangible and adverse, but intolerable. *Id.* "The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions." *Tran v. Trs. of State Colls.*, 355 F.3d 1263, 1270 (10th Cir. 2004).

Defendant seeks summary judgment on plaintiff's constructive discharge claim on the ground that she did not give Speedway a reasonable chance to remedy the harassment.

Defendant argues the court should follow the approach of the Seventh and Eighth Circuits that an employee who quits without giving his or her employer a reasonable chance to work out a problem has not been constructively discharged. *See Vajdl v. Mesabi Academy of KidsPeace, Inc.*, 484 F.3d 546, 553 (8th Cir 2007); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001). The Tenth Circuit once briefly cited this principle, thus suggesting that it might follow this rule of law but yet not elaborating further upon what it means. *Yearous v. Niobrara County Mem. Hosp.*, 128 F.3d 1351, 1357 (10th Cir. 1997). In support of this argument, Speedway points out that when Ms. Rush and Mr. Parks discussed Mr. Conroy's harassment, she asked him not to take action; that once Speedway management became aware of Mr. Conroy's conduct in late October or early November of 2005, management took prompt action by confronting Mr. Conroy about the allegations, issuing a written reprimand, and advising Mr. Conroy that any further conduct could result in his termination; that Speedway presented Ms. Rush with the option of transferring to the porter position; that Speedway management advised her that any further misconduct by Mr. Conroy would not be tolerated; that after that Mr. Conroy did not make any further inappropriate comments to her; and that when Ms. Rush overheard him make offensive comments to other individuals she did not bring this to the attention of Speedway management before she left the workplace. According to Speedway, when Ms. Rush chose to act precipitously she denied Speedway the opportunity to resolve the situation.

In response, plaintiff contends that in cases similar to this one, courts have found sufficient evidence to withstand judgment as a matter of law. For example, in *Kimzey v. Wal-*

19

*Mart Stores, Inc.*, 107 F.3d 568 (8th Cir. 1997), the employer argued that the employee was not constructively discharged because once she complained to management, management responded appropriately by investigating her complaint and offering her other positions. The court rejected this argument, explaining that a reasonable jury could find that the employee had been harassed throughout her employment, that she had complained to different members of management on different occasions, that management generally ignored her complaints, and that management's indifference rendered her working conditions intolerable. *Id.* at 574-75. Also, in *Van Steenburgh v. Rival Co.*, 171 F.3d 1155 (8th Cir. 1999), the court found that there was sufficient evidence to support the jury's finding of constructive discharge where the plaintiff had been subjected to sexual harassment from her supervisor for five years. There, the employee had repeatedly complained to management about the harassment and management had done nothing but orally warn the harasser. *Id.* at 1160. Plaintiff contends that, similarly, here she had complained to Mr. Parks several times from the very outset of her employment; that he did not pass along her complaints to upper management because he did not believe anything would be done about it; that Mr. Gemmer did nothing in response to Ms. Rush's oral complaint about Mr. Conroy; that the alternatives with which she was presented (other than quitting) both placed her in contact with Mr. Conroy on a regular basis; and that Speedway's remedial measures were inadequate because even after Ms. Rush returned to Mr. Conroy's supervision and his comments were no longer directed at her, he nonetheless continued to make inappropriate comments directed at other women.

Viewing the summary judgment record in the light most favorable to plaintiff, the facts present a case of constructive discharge sufficient for plaintiff to survive summary judgment.   Almost as soon as Ms. Rush's employment with Speedway began, she complained about Mr. Conroy's harassment to her supervisor, Mr. Parks, and yet Mr. Conroy's conduct continued unabated.   The court discounts Speedway's attempt to blame Ms. Rush for Mr. Parks' failure to report the harassment to upper management because, according to Speedway's anti-discrimination policy, Mr. Parks should have reported Mr. Conroy's conduct.   The fact that he believed that doing so would have been futile indicates that Speedway apparently did not communicate to its management personnel the importance of reporting sexual harassment.   When plaintiff finally complained orally to Speedway's general manager, Mr. Gemmer, he did nothing.   Just days later, she submitted a written complaint to upper management at Speedway.   In response, Speedway reprimanded Mr. Conroy.   But, in light of the fact that he promptly continued to make the same type of inappropriate comments in her presence (albeit, even if to other women) suggests that the so-called reprimand was so tepid that Speedway management did not impress upon him the seriousness of his conduct.   And, a rational trier of fact could also conclude that a reasonable employee in Ms. Rush's position would not have considered Speedway's offer to transfer her to the porter position to be a viable one because she was physically unable to perform the work required by the position and she would have continued to be exposed to Mr. Conroy's vulgarities in any event.   Viewing these facts in the light most favorable to Ms. Rush, a rational trier of fact could conclude that she gave Speedway a reasonable chance to end the

harassment such that by the time she left Speedway management's overall indifference had led to a situation so intolerable that she had no reasonable choice but to resign. Accordingly, defendant's motion for summary judgment on plaintiff's constructive discharge claim is denied.

On a related note, Speedway also seeks summary judgment on plaintiff's claim for back pay for the time period from February of 2006 to May of 2007 when plaintiff failed to mitigate her damages because during that time period she was not using reasonable diligence to find other suitable employment. In response, plaintiff concedes that she did not actively seek employment from March of 2006 to March of 2007 due to pregnancy complications and child birth. The court, then, will grant summary judgment on that aspect of plaintiff's claim for back pay. As to plaintiff's back pay claim for the two remaining disputed time periods before and after the undisputed time period, Ms. Rush testified in her deposition that she was actively searching for employment for three to four months after she left her employment at Speedway, which would have been as late as early March of 2006, and she began searching for employment again in March of 2007. Thus, Speedway's motion for summary judgment on the disputed aspects of plaintiff's claim for back pay is denied.

## IV.    Punitive Damages

Speedway also seeks summary judgment to the extent that plaintiff seeks to hold Speedway vicariously liable for Mr. Parks' failure to advise upper management about Mr. Conroy's misconduct in light of Speedway's alleged good faith efforts to comply with Title VII under the doctrine announced in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 545-

46 (1999).  Plaintiff objects to Speedway's assertion of this defense because Speedway did not raise it for the first time until after the final pretrial order was entered in this case.  That final pretrial order was entered on August 10, 2007.  Less than two weeks later, on August 23, 2007, Speedway filed a motion to amend the pretrial order to assert a good faith defense based on the *Kolstad* doctrine.

Under Title VII, punitive damages are available if a plaintiff proves that an employer engaged in discriminatory practices "with malice or with reckless indifference" to the plaintiff's federally protected rights.  42 U.S.C. § 1981a(b)(1).  In *Kolstad*, the Supreme Court provided a framework for the award of punitive damages under § 1981a(b)(1).  *Davey v. Lockheed Martin Corp.*, 301 F.3d 1204, 1208 (10th Cir. 2002).  First, the plaintiff must establish that the employer acted with knowledge that its actions violated federal law.  *Id.* If so, the plaintiff must then demonstrate that the actions of the employee who discriminated against the plaintiff is a managerial agent who acted within the scope of employment.  *Id.* at 1208-09.  The Court provided employers with a defense to punitive damages: even if the plaintiff establishes that the employer's managerial employees recklessly disregarded federally protected rights while acting within the scope of employment, punitive damages will not be awarded if the employer shows that it engaged in good faith efforts to comply with Title VII.  *Id.* at 1209.  Consequently, the *Kolstad* doctrine provides that "'in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the

employer's good faith efforts to comply with Title VII.'" *Id.* (quoting *Kolstad*, 527 U.S. at 545).

The court turns first to Speedway's motion to amend the pretrial order to assert a good faith defense based on the *Kolstad* doctrine.  A pretrial order may be modified "only to prevent manifest injustice."  Fed. R. Civ. P. 16(e).  The burden of demonstrating manifest injustice is on the party seeking modification.  *Koch v. Koch Indus.*, 203 F.3d 1202, 1222 (10th Cir. 2000).  The court is to consider the following four factors in deciding whether to permit amendment of a pretrial order: (1) the prejudice or surprise to the opposing party, (2) the ability to cure that prejudice, (3) disruption to the orderly and efficient trial of the case by inclusion of the new issue, and (4) bad faith by the party seeking to modify the order.  *Id.* The court should also consider whether the party seeking the amendment formally and timely sought modification.  *Id.*

Here, the court is not persuaded that Speedway timely filed its motion to amend. Speedway claims that the impetus for its motion was testimony given during Mr. Parks' deposition.  This deposition, however, was taken on July 27, 2007, which was before the parties' proposed pretrial order was due to be submitted to the court on July 30, 2007, and before the final pretrial conference on August 6, 2007.  Thus, Speedway was presumably aware of the facts on which this motion was based and therefore could have and should have sought to make sure that the pretrial order accurately reflected its contentions and theories in the first instance.

24

Nonetheless, the court believes that it would be manifestly unjust not to permit the amendment primarily because the Tenth Circuit has not decided whether the so-called *Kolstad* "defense" is an affirmative defense on which the defendant bears the burden of proof or whether in order to recover punitive damages the plaintiff must disprove the defendant's good faith compliance with Title VII. *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1137 n.3 (10th Cir. 2006); *Davey*, 301 F.3d at 1209; *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1209 n.4 (10th Cir. 2000). Given the unsettled state of the law on this issue, then, it is unclear whether Speedway even needs to include this theory as an affirmative defense in the pretrial order or whether this issue is one that is already implicit within plaintiff's punitive damage claim. Either way, allowing amendment of the pretrial order would ensure the full and fair litigation of plaintiff's punitive damage claim. Also in light of the unsettled state of the law concerning which party bears the burden of proof on this issue, the court is unpersuaded by plaintiff's conclusory allegation of prejudice because plaintiff was on notice that the *Kolstad* doctrine might be part and parcel of her burden of proof on a claim for punitive damages based on Speedway's alleged vicarious liability for Mr. Parks' inaction. The trial of this case is still more than one month away. Thus, inclusion of this issue should not disrupt the orderly and efficient trial of this case. And, if plaintiff truly feels prejudiced by Speedway's belated assertion of this issue, that prejudice can be cured if plaintiff wishes to seek leave to conduct a round of expedited discovery on this issue prior to trial. Moreover, the court is unpersuaded that Speedway's belated motion is the result of its bad faith, particularly in light of the unsettled state of the law concerning who bears the burden of proof

on this issue.  In sum, then, the balance of factors weigh in favor of granting the motion to amend.  Accordingly, the court will grant defendant's motion to amend the pretrial order.  *See, e.g.*, *Davey*, 301 F.3d at 1212 (court abused its discretion by denying a motion to amend the pretrial order to assert a *Kolstad* defense).

The court then turns to defendant's motion for summary judgment based on the good faith defense recognized by the Supreme Court in *Kolstad*.  In order for an employer to avail itself of *Kolstad*'s good-faith-compliance standard, an employer must at least (1) adopt anti-discrimination policies, (2) make a good faith effort to educate its employees about these policies and the statutory prohibitions, and (3) make good faith efforts to enforce anti-discrimination policies.  *McInnis*, 458 F.3d at 1138; *Cadena*, 224 F.3d at 1210.  Here, the summary judgment record demonstrates that Speedway adopted anti-discrimination policies and perhaps even made some effort to educate its employees about those policies and laws prohibiting sexual harassment.  But, the record is by no means sufficiently clear about the nature and extent of Speedway's efforts to educate its employees about and enforce its policies such that Speedway would be entitled to judgment as a matter of law on this issue.  Most notably, although Speedway had a policy instructing managerial employees how to report sexual harassment, the summary judgment record does not reflect the extent to which Speedway educated its managerial employees (via Ethos training or otherwise) about the handling of sexual harassment complaints or the extent to which Speedway undertook meaningful efforts to actually enforce that policy.  Thus, whether Mr. Parks' decision not to report Mr. Conroy's harassment was contrary to Speedway's good faith efforts to comply

with Title VII is a question for the trier of fact.  Accordingly, this aspect of defendant's motion for summary judgment is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (doc. #41) is granted in part and denied in part as set forth above.

**IT IS FURTHER ORDERED THAT** Defendant's Motion to Amend Pretrial Order (doc. #37) is granted.

**IT IS SO ORDERED** this 4th day of December, 2007.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

27